UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GLORIA BARAJAS, | ) | 1:02cv6202 DLB HC |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PETITION FOR |
| Petitioner, | ) | WRIT OF HABEAS CORPUS |
| | ) | |
| v. | ) | (Document 1) |
| | ) | |
| KAREN WISE, PAROLE AGENT, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

Petitioner is on parole from a state conviction and proceeding with counsel in this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**[1]

On August 4, 1998, in the Fresno County Superior Court, a jury convicted Petitioner of (1) conspiracy to sell more than 14.25 grams of heroin; (2) possession of more than 14.25 grams

---

[1] This information is derived from Petitioner's petition for writ of habeas corpus and Respondent's answer to the petition.

1

of heroin for sale; (3) transporting heroin; and (4) offering to sell 14.25 grams or more of heroin.[2] She was sentenced to three years in prison.[3]

Petitioner appealed to the Fifth District Court of Appeal. On August 22, 2000, the court affirmed Petitioner's conviction and sentence.

Petitioner next filed a petition for review in the California Supreme Court. The court denied the petition on November 1, 2000.

On January 24, 2002, Petitioner filed a petition for writ of habeas corpus in the Fresno County Superior Court. The petition was denied on January 31, 2002.

Petitioner filed a petition for writ of habeas corpus in the Fifth District Court of Appeal on March 1, 2002. The court denied the petition on March 7, 2002.

On April 12, 2002, Petition filed a petition for writ of habeas corpus in the California Supreme Court. The court denied the petition on September 11, 2002.

Petitioner filed the instant petition for writ of habeas corpus on September 30, 2002. After granting in part Respondent's motion to dismiss, the following claims remain: (1) the trial court's refusal to supply the informant's address violated Petitioner's rights under the Confrontation Clause and her right to a fair trial; and (2) there was insufficient evidence to convict Petitioner of possession of heroin for sale.

Respondent filed its answer on November 17, 2003.

Petitioner filed her traverse on July 14, 2004.

## STATEMENT OF FACTS

Prosecution Case

Special Agent Alfredo Cardwood of the California Department of Justice Bureau of Narcotic Enforcement ("BNE") testified that Maria Arellano, the informant in the instant case, received $4,000 in cash approximately two weeks after the arrests. RT 632,635-636, 657. Agent

---

[2] Petitioner was tried with her two co-defendants, Juan Hernandez and Manuel Soto.

[3] At the time Petitioner filed her petition, she was out on parole. Although she may no longer be on parole at the time of this decision, her petition is not rendered moot. There is a presumption that a wrongful criminal conviction has "collateral consequences" so that Petitioner's release does not render the petition moot. See Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978 (1998).

Cardwood debriefed Arellano in February 1998 regarding information she had obtained and worked with her to set up the heroin transaction between Arellano and co-defendant Hernandez. RT 636-643, 644-648. This was the first time Agent Cardwood had worked with Arellano, but he knew she was reliable based on her working history with the BNE. RT 657-658. He explained that Arellano would not have been paid if the deal had not gone through, and that the amount of the payment was determined after Petitioner was arrested. RT 666.

Arellano testified that she uses the name Blanca when she works as an informant. RT 671-672. She has worked as a confidential informant for twenty years and receives monetary compensation. RT 674. She has never had to work off a criminal charge. RT 674. Arellano supplements her income with a job at a cannery. RT 674.

In January 1998, Arellano went to Radio Shack on Blackstone Avenue to purchase a cellular telephone. RT 675. She was working with an employee when Petitioner approached her and asked her where she was from. RT 676. Arellano responded that she was from Sinaloa, and Petitioner stated that her boyfriend was from Sinaloa. Petitioner asked Arellano if she was in "la movida"- a term for people involved in selling drugs. RT 677-678. She said yes and Petitioner told her that her boyfriend and brother-in-law were selling heroin. RT 678-679. Petitioner tried to get her to talk to Hernandez, but she said no and instead asked for a phone number. RT 679. Petitioner gave her Hernandez's phone number. RT 679. Arellano later contacted Agent Eloy Romero at the BNE, who told her just to talk to Hernandez, but not to do anything because they did not have the time. RT 683.

On the night she met Petitioner, Arellano called Hernandez, who indicated that Petitioner had already told him that she would be calling. RT 684-685. They discussed heroin and Hernandez indicated that he would sell it for $1,200 per ounce. RT 685-686. He also told her that she would have to act quickly because he was leaving for Sinaloa for two weeks. RT 686. She tried calling him again, but could not reach him. RT 687. She got in touch with Petitioner, who told her that Hernandez had left for Sinaloa and gave her a beeper number of a person named Clemente. RT 687-688. She called the number and the man who answered knew she

would be calling and asked when they could see each other.  RT 688.  They met at a McDonald's and she told him that she needed 25 ounces of heroin.  RT 689.

Arellano contacted Petitioner and told her that she did not complete a deal with Clemente. RT 692.  Petitioner told her not to worry, that her boyfriend was arriving soon.  RT 692. Arellano next talked to Hernandez and told him that she wanted 10 ounces of heroin.  RT 692. She contacted Petitioner, who told her to let her know what they discussed because they would owe Petitioner money.  RT 693.

Arellano told Hernandez to meet her at the McDonald's at Olive and 99.  RT 698.  Before going to the McDonald's, she was searched by BNE agents and wired with a transmitting device. She was also followed to the McDonald's and kept under surveillance the entire time.  RT 648, 698-699, 921-922, 965-967.  Hernandez arrived, found Arellano, and told her that he was going to call his friend to get the stuff.  RT 700.  A small blue car arrived and Hernandez told the driver to open the package so that Arellano could see the contents.  The package was wrapped with wide black tape.  RT 702.  The substance inside looked "like black, like brown" and had "a lot of odor like vinegar."  RT 704.  She had seen a substance like this about 20 times before while working as an informant and believed it to be heroin.  RT 704-705.  Arellano then walked away and the police moved in.  RT 718.  Petitioner was not present during this transaction.  RT 884, 919.

On cross-examination, Arellano testified that she had worked on about 100 cases that resulted in arrests.  RT 735.  Of these, about 20 involved heroin and she was asked to testify in about 30.  RT 735.  She admitted that she works as a confidential informant for money, but also works at a cannery three and one-half months a year.  RT 740-741.  She also works at a restaurant.  RT 741.  Four thousand dollars is an average amount of compensation.  RT 743.  She works for the BNE and other agencies.  RT 744.

Special Agent supervisor Romero testified that he has known Arellano for over 10 years and has worked with her on numerous investigations.  RT 849.  Arellano called him in January 1998 and told him that she met a female that had offered to sell her heroin.  RT 850.  He assigned the case to Agent Cardwood.  RT 852.  Agent Romero was present at the McDonald's where the

drug transaction took place. As he apprehended Hernandez, the individual in the car (co-defendant Soto) fled on foot and threw an object as he ran. RT 853-856. Soto was eventually apprehended by another agent. RT 856. A search of the car revealed 15 bindles of cocaine and 18 foil bindles of heroin. The agents also found in Soto's possession a sheet commonly used by drug dealers to list amounts paid or owed by drug users. RT 880, 927-928, 960, 961, 963, 983, 1055, 1105. Despite searching in the dark with flashlights and a drug dog for three hours, the agents were unable to locate the 10-ounce package of heroin. RT 712, 714, 718, 760, 853, 854-857, 867-868, 893, 899-900, 974-975, 978, 1097-1101, 1108.

Petitioner was arrested the day after the drug transaction without incident. RT 1117. Agents recovered telephone bills from her home and a cellular phone from the blue Ford Escort. Telephone records showed the placement of numerous calls between a cell phone located in the car and Petitioner's residence. RT 821-822, 829-840, 1081-1082, 1117-1118. There was no evidence of narcotics, narcotics paraphernalia or evidence of involvement in narcotics sales found in her home or car. RT 1117-1118, 1134-1135.

Arellano initially testified that she recorded three or four telephone conversations with Petitioner, but subsequently admitted that she had confused her testimony. RT 1036.

Defense

Petitioner testified on her own behalf. She explained that "Blanca" entered the store and was helped by another sales clerk. RT 1148. Blanca took her aside and asked if she "knew of somebody about la movida." RT 1150. Petitioner testified that Blanca kept insisting that Petitioner knew someone who sold drugs, but Petitioner told her that she didn't want to talk about it at the store. RT 1151. Petitioner gave her Hernandez's phone number and Blanca asked Petitioner to call him and tell him that she would be calling. RT 1151. Petitioner called Hernandez that day and told him that a woman wanted to talk to him. RT 1152. Petitioner gave Blanca her home telephone number because she "wanted her to leave [her] alone." RT 1153. When Blanca would call, she always mentioned drugs and Petitioner just went along with it. RT 1153. Petitioner did not have any conversations with Blanca about the transaction involving 10

ounces of heroin or the transaction involving two ounces of heroin. RT 1153. Petitioner denied ever doing a drug deal herself. RT 1154.

Blanca called Petitioner after she was unable to get Hernandez and asked for another phone number. RT 1154-1155. Petitioner gave her the pager number of her child's father. RT 1155. Petitioner did not know that there was going to be a drug sale on February 4, 1998, and had only talked to Hernandez about whether Blanca could be trusted. RT 1156. Petitioner denied that she told Blanca that Hernandez would pay her and instead testified that Blanca offered to pay her. RT 1156. Petitioner didn't have anything to do with the drug deal and only gave Blanca the phone numbers. RT 1156. She also testified that she did not know whether or not Hernandez could supply Blanca with drugs. RT 1171.

## **DISCUSSION**

A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

**DISCUSSION**

A.   Confrontation Clause

Petitioner contends that her conviction was obtained in violation of the Confrontation Clause and Due Process clause because the trial court refused to order production of the informant's address.

1.   Procedural History

Prior to trial, Petitioner filed a motion to compel disclosure of the informant's current and previous addresses for a five year period, any arrest or conviction records, evidence of any promises made or consideration paid in connection with Petitioner's case, prior payment records, any evidence affecting issues of bias or credibility, and identification of the informant's prior testimony. CT 139-148. Petitioner argued that disclosure of the addresses was necessary because the informant was the sole material witness and set up the criminal occurrence. CT 145. According to Petitioner, disclosure of the informant's addresses was necessary to conduct investigation as to her credibility and background prior to trial. CT 147.

In a written opposition, the prosecution objected to the disclosure of current and past addresses because disclosure would "jeopardize[] the informant's ability to continue to work as an informant" and dramatically increase the "risk of threats or harm..." CT 152-153. The prosecution further explained that the informant was not a convicted criminal, worked as an informant for about 20 years, had no misdemeanor or felony convictions and worked strictly for money. CT 154. The prosecution did not object to disclosure of the requested discovery regarding the informant's criminal record and any consideration paid in Petitioner's case. CT 154-155. There was no response to the request for informant's prior payment records, other evidence affecting credibility issues, or identification of the informant's prior testimony. CT 150-158.

The court held a hearing on the motion on June 17, 1998. RT 407. Petitioner argued that the informant was an "enigma" because she has worked in the profession for 20 years, but had no record of convictions or cases "that went sour." RT 408. Without her addresses, there was no way to place the informant in her "proper setting" or determine her history. RT 408. Counsel

further explained that when he interviewed the informant, she indicated that she last worked in San Diego, but has also worked in San Francisco and other California cities. RT 408. Addresses would allow Petitioner to determine if she left cities voluntarily or involuntarily. AR 408-409.

The prosecutor indicated that he had no information that the informant has had any addresses other than ones in Fresno, but that he nonetheless objected to disclosing this information because there had not been a good showing as to why the information was necessary. RT 410. He argued that disclosure would impact the "effectiveness for this informant to do future investigations and subject her to risks and danger because there is no question when you are a tattle tale or snitch people don't like you." RT 410. The informant was made available for an interview and was interviewed for approximately 30 minutes and provided "some information," although "there were certain areas she said she would rather discuss in court which is her prerogative." RT 410. The prosecutor acknowledged that during the interview, the informant refused to give her current address. RT 410-411.

On June 18, 1998, the court denied the motion in a minute order without explanation. CT 164.

      2.      Petitioner's Argument

Petitioner explains that the paid informant was the principal witness against her, and that the trial court's refusal to disclose the informant's current and past addresses and the information regarding prior cases in which the informant testified prevented Petitioner from determining her reputation for truth and veracity. Petitioner contends that because there was an issue as to whether Petitioner approached the informant, or vice versa, it was important to investigate the informant's veracity and/or to develop any impeachment information for purposes of cross-examination (i.e., whether the informant had a pattern in her testimony of people approaching her in public and asking her if she was involved in the "movida."). According to Petitioner, this information would have been relevant and would have formed a crucial basis for cross-examination and support of the entrapment defense.

Petitioner relies mainly on Alvarado v. Superior Court, 23 Cal.4th 1121 (2000), and argues that this case "conclusively demonstrates that the rulings of both the trial court and

9

1 California Court of Appeal regarding petitioner's right to learn and investigate the only witness
2 against her were incorrect as a matter of federal law." Traverse, at 1.  Based on this case,
3 Petitioner unsuccessfully moved the Court of Appeal to recall its remittitur and filed
4 unsuccessful habeas petitions at the state level.

5    3.    Analysis

6 The Sixth Amendment right of an accused to confront the witnesses against him is a
7 "fundamental right" and is made obligatory on the States by the Fourteenth Amendment.  Pointer
8 v. Texas, 380 U.S. 400, 403 (1965).  Indeed, the Supreme Court has held that a denial of cross-
9 examination without waiver "would be constitutional error of the first magnitude and no amount
10 of showing of want of prejudice would cure it."  Brookhart v. Janis, 384 U.S. 1, 3 (1966).

11 Under this framework, the Supreme Court has held that the "witness' name and address
12 open countless avenues of in-court examination and out-of-court investigation.  To forbid this
13 most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-
14 examination itself."  Smith v. Illinois, 390 U.S. 129, 131 (1968).  In Smith, the petitioner was
15 denied the right to ask the principal prosecution witness either his name or where he lived,
16 although the witness admitted that the name he had given was false.  In finding a constitutional
17 violation, the Court explained that "when the credibility of a witness is in issue, the very starting
18 point in 'exposing falsehood and bringing out the truth' through cross-examination must
19 necessarily be to ask the witness who he is and where he lives."  Smith, 390 U.S. at 131; Alford
20 v. United States, 282 U.S. 687, 691-693 (1931).

21 The right to discover the name and address of a witness is not absolute, however.  As the
22 Ninth Circuit has explained, Smith "does not establish a rigid rule of disclosure, but rather
23 discusses disclosure against a background of factors weighing conversely, such as personal safety
24 of the witness."  United States v. Cosby, 500 F.2d 405, 407 (9th Cir. 1974).  A trial judge has
25 wide latitude to impose reasonable limits on cross-examination based on concerns such as
26 harassment, prejudice, confusion of the issues or the witness's safety.  Clark v. Ricketts, 958 F.2d
27 851, 855 (9th Cir. 1991).  In cases that involve an informant, curtailment of cross-examination
28 into the informant's address must be supported by "some indication, provided by either the

1  Government or the witness, why open-court disclosure should be prevented." United States v.
2  Hernandez, 608 F.2d 741, 745 (9th Cir. 1979); United States v. Harris, 501 F.2d 1,9 (9th Cir.
3  1974) see also Smith, 390 U.S. at 134-135 (White J. And Marshal, J., concurring) (suggesting
4  that Government or witness should come forward with some showing justifying need to withhold
5  information).

6  Similarly, the Seventh Circuit has held that Alford and Smith make it clear that a
7  defendant is presumptively entitled to cross-examine a key government witness as to his address
8  and place of employment. United States v. Navarro, 737 F.2d 625, 633 (7th Cir. 1984).
9  However, denial of this right does not automatically require a new trial. Id. Rather, the initial
10 question is whether or not defendant has been given sufficient "opportunity to place the witness
11 in his proper setting." Id., citing United States v. Alston, 460 F.2d 48, 51-52 (5th Cir. 1972). In
12 deciding whether such information should be disclosed, the court may consider the impact on
13 continuing narcotics investigations, the value of the information in cross-examination, and
14 whether there is a threat to the life of the witness. Id at 633-634; United States v. Palermo, 410
15 F.2d 468, 472 (7th Cir. 1969). As in the Ninth Circuit, the Seventh Circuit requires a showing of
16 these factors prior to curtailing cross-examination. In Palermo, the court explained that the threat
17 to a witness must be "actual and not a result of conjecture." Palermo, 410 F.2d at 472. The
18 government bears the burden of demonstrating the existence of such a threat and must disclose to
19 the judge, *in camera*, the relevant information. Id.

20 Here, the Court of Appeal denied Petitioner's argument that the trial court's failure to
21 grant her motion for disclosure of the informant's addresses required reversal.[4] The court
22 analyzed numerous federal and state cases, including Smith and Alford, and set forth evidence
23 that, according to the court, disclosed to the jury that Arellano was a paid informant but did not
24 suggest that she had a bad reputation for truth or veracity in her community. Opinion, at 20-21.

---

[4] In reviewing habeas cases, federal courts "look through" to the last reasoned decision in determining whether the state courts' rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1). LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000). Here, although the Fresno County Superior Court denied Petitioner's habeas petition with more than a summary denial, it simply explained why Alvarado v. Superior Court, 23 Cal.4th 1121 (2000), did not warrant departure from the Court of Appeal's decision. Therefore, this Court will review the Court of Appeal decision in assessing Petitioner's claims.

The court also explains that aside from non-disclosure of Arellano's address, Petitioner's cross-examination was "virtually unrestricted." Opinion, at 21.

While this may be true, the Court of Appeal misapplied the standard required to justify such a restriction in cross-examination. The Court of Appeal correctly recognized the importance of the right to cross-examination, and that such a right may be curtailed in certain situations, but set forth an improper standard by which to curtail the right. Citing both California and federal cases, the court explained that "[i]t does not take a lively imagination to realize that, in view of the violence found in the world of the narcotic pusher and user, disclosure [of a home address] might constitute a death warrant for the informer," and "[i]t is no secret that informers, whose identifies are revealed prior to trial are often 'among the missing' when the trial date finally arrives." Opinion, 21-22. The court then explained that pursuant to California Penal Code section 1054.7, "good cause" for nondisclosure is limited to "threats or possible danger to the safety of a victim or witness," among other things. The court concluded that "the concerns articulated by the prosecutor were more than sufficient to support the trial court's ruling in favor of nondisclosure." Opinion, at 22.

Federal precedent, however, requires a more specific showing to justify nondisclosure. As previously set forth, in cases that involve an informant, curtailment of cross-examination into the informant's address must be supported by "some indication, provided by either the Government or the witness, why open-court disclosure should be prevented." United States v. Hernandez, 608 F.2d 741, 745 (9th Cir. 1979); United States v. Harris, 501 F.2d 1,9 (9th Cir. 1974) see also Smith, 390 U.S. at 134-135 (White J. And Marshal, J., concurring) (suggesting that Government or witness should come forward with some showing justifying need to withhold information). The Seventh Circuit takes it a step further, requiring that a threat to a witness must be "actual and not a result of conjecture." Palermo, 410 F.2d at 472.

There was no such showing before the trial court. The only reasons given by the prosecutor in arguing for nondisclosure were little more than generalized, vague, non-specific statements. In his written opposition, the prosecutor argued that disclosure would "jeopardize[] the informant's ability to continue to work as an informant" and dramatically increase the "risk

of threats or harm..." CT 152-153.  At oral argument on the motion, the prosecutor argued that disclosure would impact the "effectiveness for this informant to do future investigations and subject her to risks and danger because there is no question when you are a tattle tale or snitch people don't like you."  RT 410.  However, in this case as on previous occasions the informant testified in open court and gave her true name factors which seem to negate the prosecutor's arguments about effectiveness in future cases and the risk of harm.

In light of the federal precedent, and given the importance of cross-examination and the fact that Arellano was the sole witness against Petitioner, the Court of Appeal's decision that the prosecution's showing was sufficient resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.  While Petitioner was provided with an opportunity to cross-examine Arellano and establish her background as a paid confidential informant, she was not provided with an opportunity to elicit information about Arellano's former and current addresses so as to identify Arellano within her environment.  Smith, 390 U.S. at 132.  Arellano had been a paid informant for 20 years and during that time, has worked in cities all over California.  Denying Petitioner the right to discover her addresses denied her the right to examine the circumstances of Arellano's past activities, which may have led to material with which to cross-examine her.  While this denial may be appropriate in some cases, a sufficient showing was not made in this case.  This is especially true given that the prosecution asked the jury to believe Arellano's version of events over that of Petitioner.

This finding does not end the inquiry.  Violations of the Confrontation Clause are subject to harmless error review.  Coy v. Iowa, 487 U.S. 1012 (1988); Delaware v. Van Arsdall, 475 U.S. 673 (1986); Belmontes v. Brown, 414 F.3d 1094, 1123 (9th Cir. 2005).  The Court must therefore determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  Such a determination is made by examining the remaining evidence presented at trial.  Coy, 487 U.S. at 1021-1022.

Here, Arellano was the *only* witness against Petitioner.  The testimony against Petitioner was limited to her role in the events at the Radio Shack and during subsequent unrecorded

conversations with Arellano. Petitioner was not present during the actual drug transaction and no other evidence connected her to the crime . Therefore the Court cannot say that the error was harmless.

B.    <u>Insufficient Evidence</u>

Petitioner contends that her conviction for possession of heroin for sale must be reversed due to an insufficiency of evidence to establish that she had either actual or constructive possession of the heroin involved in this case.

The law on insufficiency of the evidence claim is clearly established. The Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. <u>Id</u>. at 324, n. 16.

In count two of the information, Petitioner was charged with possession of heroin for sale, in violation of California Health and Safety Code section 11351. To prove a violation, the evidence must prove that the defendant exercised dominion and control over the drug with knowledge of its character and presence. <u>People v. Thomas</u>, 45 Cal.App.3d 749, 759 (1975). Physical possession of the drug is not required, nor is exclusive possession of the premises where the drug is found. <u>Id.</u>, citing <u>People v. Fusaro</u>, 18 Cal.App.3d 877, 891 (1971). However, mere access to the place where drugs are found is not enough. Knowledge of presence and character can be shown circumstantially. <u>Id.</u> The intent to sell may be found by reasonable inference drawn from circumstantial evidence. <u>People v. Fusaro</u>, 18 Cal.App.3d at 891.

Petitioner explains that the jury rejected the only evidence offered to suggest that she exercised control over, or the right to control, the heroin. In their findings regarding the alleged overt acts specified in relation to the conspiracy charge, the jury rejected Arellano's testimony that Petitioner had offered to conduct the heroin sale herself. CT 224. Since a person must be guilty of possession of heroin in order to be found guilty of possession of heroin for sale, Petitioner argues that she could not have been found guilty of possession of heroin for sale absent

"evidence which is reasonable, credible and of solid value" that she had actual or constructive possession of the heroin with the specific intent to sell it. Traverse, at 27.

In denying this claim on appeal, the Court of Appeal cited California law in explaining that aiding and abetting does not require participation in an agreement to commit an offense, but merely assistance in committing the offense. Opinion, at 25. The court also explained that one may be liable as an aider and abettor even though she does not personally engage in all elements of the crime and even if she is not in the room where the crime occurs. Opinion, at 25. The court then found:

> Here, the jury could reasonably and correctly find that [Petitioner] knew of Hernandez and Soto's illegal purposes and encouraged both the possession and sale of heroin by bringing Hernandez together with the potential buyer, Maria Arellano. Hernandez was the uncle of the child that [Petitioner] was expecting. She sought to earn money from Hernandez by finding customers to purchase his illicit wares. The jury could quite reasonably conclude that [Petitioner] intended for Arellano to purchase heroin from Hernandez. [Petitioner] approached Arellano, essentially asked whether she was interested in purchasing heroin, and then helped her make contact with Hernandez by providing his and [Petitioner's] phone numbers. When Hernandez was temporarily unavailable to complete the transaction, [Petitioner] provided information about another drug connection- the father of her daughter. When the latter source did not work out, [Petitioner] assured Arellano that she knew many sources of drugs. When Hernandez became leery of Arellano, [Petitioner] suggested she could handle the transaction herself. [Petitioner] also reassured Hernandez that she trusted Arellano. Contemporary telephone records indicated that [Petitioner] and Hernandez had been in contact prior to the buy.
>
> As the People point out, [Petitioner] helped set up the heroin deal that occurred at McDonald's restaurant on Olive Avenue and Freeway 99 in Fresno. Hernandez and Soto were in possession of a substantial amount of heroin for sale. [Petitioner] was equally culpable because she knew it was illegal to deal in heroin, nevertheless encouraged the crime, and made telephone calls to promote the illegal sale of narcotics. She clearly facilitated the actions of the other perpetrators, a prerequisite of aiding and abetting. [citation omitted]. The mere fact that she did not personally engage in all of the elements of the crime of possession of heroin for sale did not insulate her from culpability for that charged offense. [citation omitted].

Opinion, at 27-28.

The Court of Appeal also explained that Petitioner attempted to "read too much into" People v. Mitchell, 53 Cal.App.3d 21 (1975), the main case upon which she relied. Opinion, at 26. Contrary to Petitioner's contention, the decision in Mitchell does **not** require a finding of dominion and control as a prerequisite to a verdict of guilt for aiding and abetting the possession of a controlled substance for sale. Opinion, at 26 (emphasis in original). Instead, Mitchell cited another case that recognized the principal that a conviction for possession of a narcotic may be

15

upheld where there is evidence that the defendant aided and abetted in committing the crime of possession of narcotics.  Opinion, at 26-27.  A federal court has no basis for disputing a state's interpretation of its own law.  Clemons v. Mississippi, 494 U.S. 738, 739-40 (1990).

If Arellano's testimony is believed, there was sufficient evidence to allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.  As explained above, an aider and abetter need not participate in the actual crime to be found guilty.  Instead, as the evidence demonstrates here, an aider and abetter may be found guilty based on assisting in the charged offense.  The Court of Appeal rejected Petitioner's interpretation of state law and this Court is bound by that finding.  Therefore, as the jury could reasonably have found that Petitioner helped set up the crime of possession for sale, knew that it was illegal to deal in heroin, and nevertheless encouraged the crime, Petitioner's claim fails.[5]  The state courts' determination was not contrary to, or an unreasonable application of, clearly established federal law.

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1. The petition for writ of habeas corpus is GRANTED, subject to the State's right to retry Petitioner; and
2. The State must, within ninety (90) days of the date of service of this order, inform the Court whether it will retry Petitioner.

IT IS SO ORDERED.

Dated:   February 14, 2006                        /s/ Dennis L. Beck
3b142a                                      UNITED STATES MAGISTRATE JUDGE

---

[5] Because Petitioner was not given an opportunity to sufficiently cross-examine Arellano as determined above, the resolution of this claim is based solely on the assumption that Arellano's testimony was credible.